OPINION OF THE COURT
Joseph R. Glownia, J.
The petitioners request an order and judgment permanently enjoining respondents from effectuating a directive dated May *508 19, 1992 issued by respondent Commissioner Paul Shanks seeking to close various fire companies in the City of Buffalo unless and until approval is obtained by the Buffalo Common Council. In addition, petitioners request a declaratory judgment dictating the rights of the parties.
On Friday, May 22, 1992, at the conclusion of arguments, respondents were temporarily enjoined under CPLR 7502 (c) from implementing the directive pending a factual hearing on May 27, 1992. Said hearing was scheduled to hear further evidence in support of petitioner’s claim of irreparable harm which may render any ultimate arbitration decision of petitioner’s grievance ineffectual and to take testimony regarding the petitioner’s claim that respondent’s directive violates section 263 of the Buffalo City Charter. At the conclusion of testimony the temporary restraint under CPLR 7502 (c) was continued.
The directive in question was to take effect on May 22, 1992 prior to the Memorial Day weekend. It provides for a formula taking one fire company out of service when the regularly scheduled manpower is 14 firefighters short. A second company would be taken out of service when the manpower is 18 firefighters short. The stated reasoning in the directive was to reduce overtime call-ins because the Fire Department’s overtime account was expended due to the current budget crisis. The maximum reduction of fire companies in service would be two.
Petitioners contend that Buffalo City Charter § 263 establishes 25 engine companies and 13 hook and ladder companies and that those numbers cannot be diminished by directive of the Commissioner of Fire without approval of the Common Council. Further, petitioners allege in their amended petition that unless respondents are so enjoined the city will be left without timely or effective fire coverage; response time will be increased resulting in more serious fires, greater likelihood of civilian and firefighter injuries and/or death and greater likelihood of flashovers. It is alleged that this would result in irreparable harm in that it presents undue risk to the lives of members of the petitioner union and the public in general. These allegations were added in an amended petition and respondents have not amended their answer to formally admit or deny said allegations.
Respondents allege that the closing of these fire companies is only temporary and therefore, not in violation of section *509 263 of the City Charter. They allege that fire companies have historically and regularly been taken out of service on a daily basis for training purposes or when fire equipment is scheduled for maintenance. Respondents have not requested, nor has the Common Council given approval for this directive.
Prior to commencement of the hearing this court pursuant to CPLR 3001 converted the CPLR article 78 aspect of this action to an action for declaratory judgment.
Section 263 of the Buffalo City Charter states as follows: "The number of fire companies and the location thereof as of December first, nineteen hundred eighty-one, consisting of twenty-five engine 'companies and thirteen hook and ladder companies (not including the fire boat), shall be reestablished, with power in the commissioner of fire, with the approval of the common council, to add to or diminish the number thereof or relocate said companies by order, rule or regulation.”
This section was added to the City Charter as Local Laws, 1982, No. 8 of the City of Buffalo and was approved by voter referendum in the general election held November 2, 1982. There has been no previous interpretation by any court of this section.
The wording of section 263 is clearly unambiguous with respect to the establishment of "twenty-five” engine companies and "thirteen” hook and ladder companies and the Commissioner of Fire has the power by order, rule or regulation to "add to or diminish” those numbers or to relocate said companies with the approval of the Common Council.
The factual issue presented is whether the directive issued by the Commissioner effectively diminishes the number of companies because when the directive is in effect, the companies are not permanently "closed” but merely "taken out of service”.
The hearing established that since the enactment of section 263, companies have been routinely taken out of service in the normal course of operations anywhere from several minutes to several hours. During these periods of time depending on the reason for being placed out of service, the firefighters are present either with their equipment or assigned to other functions. This allows for the particular company, depending on circumstances, to be immediately called back into service.
The Commissioner’s directive provides a formula whereby firefighters are not called into work on a shift-by-shift basis. Therefore, the particular company taken out of service would *510 be unmanned for a minimum nine-hour or minimum 15-hour shift, effectively closing that company for that period of time.
Despite a temporary order from the court not to implement the directive prior to the Memorial Day weekend, the Fire Department did in fact implement the same. As a result of that action the operative effect of this directive was clear during the period beginning with the night shift on May 22, 1992 through the night shift of May 25, 1992. Rather than operating with the statutory required number of 38 combined engine and ladder companies, the Fire Department operated consistently during this four-day period of time within 36 such companies. Deputy Fire Commissioner Bulger testified that by executive decision the Fire Department stopped the implementation of the directive beginning with the next day shift with the intent to implement the directive again at the discretion of the Commissioner. He also testified that during the four-day period of time 46 firefighters were called in for overtime to meet acceptable manpower levels to operate the 36 companies in service. In addition, he testified that there are currently 97 vacant positions in the Fire Department which remain unfilled, and the necessity of overtime is in substantial part caused by these vacancies. The filling of vacancies is not a Common Council or legislative determination.
As stated above, section 263 reestablishes and mandates a set number of fire companies. Implicit in mandating a certain number of fire companies is a requirement that sufficient manpower be maintained to operate those companies. It could not have been the intent of the Common Council to mandate a certain number of companies and then allow them to sit idle on a temporary or permanent basis.
If at the discretion of the executive branch the number of unfilled positions were allowed to continue to increase, Fire Department personnel would (if it has not already) reach a level that would consistently require overtime personnel to maintain the statutory mandated number of companies. The practical effect of the directive, therefore, would be to give the Commissioner discretion to "temporarily take out of service” two fire companies consistently on a weekly, monthly or yearly basis.
Section 263 of the Charter as relevant in this case uses the term "diminish”. It does not qualify the word "diminish” using adjectives "temporary” or "permanent”. Failing to include any such adjective it must be concluded the Common *511 Council in passing this legislation intended no distinction be made. James Keane, formerly South District Common Council member who sponsored this legislation in 1982, testified that it was in response to the then and current Mayor closing two fire companies on a permanent basis. He indicated it was his intent that this legislation prohibit the executive branch from closing fire companies on either a temporary or permanent basis and he specifically recalled that the issue of temporary versus permanent was discussed with the result that no modifying language was inserted. It is notable that the issue presented at the time of enactment of this legislation involved 23 as opposed to 25 engine companies which would be the ultimate result of the Commissioner’s current directive.
If possible, a court must give effect to the plain meaning of a statute. The language of the statute should not be expanded or limited to something which the Legislature could easily have expressed but did not. (McKinney’s Cons Laws of NY, Book 1, Statutes § 94.)
In absence of statutory definition, the meaning ascribed to a word or phrase by lexicographers may serve as a useful guidepost. (Quotron Sys. v Gallman, 39 NY2d 428.) The dictionary defines "diminish” as "to make smaller or less or cause to appear smaller or less” (American Heritage Dictionary 397 [2d coll ed]). This is what has and will occur under the Commissioner’s directive.
While no legislative memorandum exists, Mayor Griffin’s 1982 veto message directed to the Common Council provides further insight into the Legislature’s intent. Mayor Griffin stated that section 263 "would increase the number of fire engine companies in the Fire Department from 23 to 25, maintain the number of hook and ladder companies at 13 and would require your approval before the Fire Commissioner could make any changes therein.” The Mayor’s message continues to state that only the Fire Commissioner "can intelligently determine the fire fighting needs and capabilities of the City. To require the consent of the legislative branch for decisions which are essentially executive in nature, not only subjects the Fire Department to restraints often incompatible with its mission, but also deprives it of the ability to respond quickly to changing conditions” (1 Common Council Proceedings of City of Buffalo 329, Mar. 23, 1982).
Despite this message the Common Council voted to override the Mayor’s veto indicating its intent to remove the Fire *512 Department from the exclusive control of the executive branch, and provide for Common Council input into decisions dealing with the level of fire protection for the City of Buffalo.
A distinction can be reached between day-to-day operations that take a fire company temporarily out of service with manpower available to place that company back into service within a short period of time, and those directives or orders that would effectively close one or more, companies by not providing manpower on a shift-by-shift basis. The latter requires Common Council approval under section 263.